**Arnold G. BARWICK, Appellant,**

v.

**The CELOTEX CORPORATION, Keene Corporation, Pittsburgh Corning Corporation, H.K. Porter, Forty-Eight Insulations, Inc., Appellees.**

No. 83–1479.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 12, 1984.

Decided June 7, 1984.

---

948

G. Brinson Williams, Barnwell, S.C. (Joseph F. Rice, Blatt & Fales, Barnwell, S.C., on brief), and Thomas F. Taft, Greenville, N.C. (Vickie Bletso, Taft, Taft & Haigler, Greenville, N.C., on brief), for appellant.

Richard V. Bennett, Winston-Salem, N.C. (William Kearns Davis, Bell, Davis & Pitt, P.A., Winston-Salem, N.C., on brief), J. Victor Bowman, Greensboro, N.C. (Perry Henson, Henson, Henson & Henson, Greensboro, N.C., on brief), Thomas N. Barefoot, Manteo, N.C. (James Billings, Smith, Anderson, Blout, Dorsett, Mitchell & Jernigan, Raleigh, N.C., on brief), Fitzhugh E. Wallace, Jr. (Wallace, Barwick, Landis, Rodgman & Bower, P.A., Kinston, N.C.), F. Blackwell Stith, Stith & Stith, New Bern, N.C., on brief), for appellees.

Before ERVIN and CHAPMAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

CHAPMAN, Circuit Judge:

The plaintiff in this diversity action appeals the order of the district court granting summary judgment to the defendants in this action alleging personal injuries due to exposure to asbestos-containing products mined, manufactured and/or sold by defendants. Plaintiff contends that there are genuine issues of material fact as to plaintiff's exposure to defendant's products during the ten year period provided under North Carolina General Statute 1–15(b).[1]

---

1. North Carolina General Statute 1–15(b) reads:

A cause of action ... having as an essential element bodily injury to the person ... which

Appellant also claims that this North Carolina statute is unconstitutional because it violates the equal protection clause of the fourteenth amendment to the United States Constitution and Article I, §§ 18 and 32 of the North Carolina Constitution. Finding no merit in appellant's exceptions, we affirm.

I

Arnold Barwick worked as a plumber and steam fitter at Seymour Johnson Air Force Base in Goldsboro, North Carolina from 1961 to 1980. His first suit was filed in the United States District Court for the Southern District of Georgia on November 9, 1979 claiming injury from exposure to products containing asbestos which were mined, manufactured and/or sold by The Celotex Corporation, Fibreboard Corporation, Keene Corporation, Carey Canada (formerly Carey Canadian Mines, Ltd.), H.K. Porter, and Forty-Eight Insulations, Inc.[2] Approximately eighteen months later, plaintiff filed the present action in the United States District Court for the Eastern District of North Carolina against the same defendants and against Pittsburgh Corning Corporation, alleging negligence, fraudulent concealment and strict liability in tort. In December 1981 the Georgia action was transferred to the Eastern District of North Carolina and consolidated with the action pending there. This transfer was with the consent of the parties.

Extensive discovery was conducted by the parties. Plaintiff was deposed in both the Georgia case and the North Carolina case as to his work record, exposure to the various products of the defendants during his twenty years of employment at Seymour Johnson Air Force Base and also as

to his physical condition and medical history.

This case proceeded through the discovery period in a sequence that has been developed for handling asbestosis litigation. Both sides submitted fairly uniform sets of interrogatories, notices to produce and requests for admissions in an effort to establish the products to which the plaintiff had been exposed, his familiarity with asbestos products and dates of exposure to the products. Also developed was the list of asbestos-containing products mined, manufactured and/or sold by the various defendants, the asbestos content of the various products and the date or dates when asbestos may have been removed from various products.

As discovery progressed the district court began the process of narrowing the issues and culling the defendants so as to dismiss those defendants whose products had not been used by the plaintiff and preparing a very complex case for trial. In January 1983 following an extensive hearing the district court entered its first pretrial order which provided:

a. By January 26, 1983 the plaintiff must designate the state-of-the-art witnesses who plaintiff reasonably anticipates will actually testify at trial.

b. By the same date the plaintiff shall designate those diagnostic witnesses who plaintiff reasonably anticipates will testify at trial.

c. By the same date the plaintiff shall designate those treating physicians who plaintiff reasonably anticipates will actually testify at trial.

d. By the same date plaintiff shall designate all other witnesses who plaintiff rea-

originated under circumstances making the injury ... not readily apparent to the claimant at the time of its origin is deemed to have accrued at the time the injury was discovered by the claimant, or ought reasonably to have been discovered by him, whichever event first occurred; provided that in such cases the period shall not exceed ten years from the last act of the defendant giving rise to the claim for relief.

N.C.G.S. 1–15(b) was repealed October 1, 1979; recodified in part at N.C.G.S. 1–52(16). Because all references in the briefs and in the district court are to 1–15(b), this section is used in this opinion.

2. These were the seven remaining defendants in an action which originally involved eighteen defendants. The other eleven have either settled or been dismissed prior to the filing of the affidavit.

sonably anticipates will actually testify at trial; and with regard to each such witness the subject of his or her testimony; if he or she will be offered as an expert, and if so, a statement of the witness's opinions and a summary of the facts and grounds for each such opinion.

e. That by the same date to designate those witnesses who will testify in person and who will testify by deposition.

f. That each party shall require the party's diagnostic witnesses to have examined all x-rays, medical records, tissue slides, and other materials which serve as a basis for the witnesses' testimony and which are known to the party or the party's attorney at the time of the witness's discovery deposition; and that each such witness be prepared to give his final trial opinion as of the date of the taking of his discovery deposition by an opposing party to the extent that he can do so on such information and materials available.

g. That by January 31, 1983 the plaintiff shall designate his master trial exhibit list.

h. That by January 31, 1983 the defendant shall designate the names, addresses and telephone numbers of the witnesses, other than diagnostic witnesses, state-of-the-art witnesses or treating physicians who defendants reasonably anticipate will testify at trial; and with regard to each such witness, the subject of his or her testimony; if he or she will be offered as an expert, and if so, a statement of the witness's opinions and a summary of the facts and grounds for each such opinion. Ten days after the defendants have been served with the plaintiff's designations in paragraphs a through g, the defendant shall designate their state-of-the-art witnesses, diagnostic witnesses and any treating physicians who defendants reasonably anticipate will actually testify at trial, and defendants must state which witnesses will testify in person and which will testify by deposition. Within ten days after the service of the plaintiff's designation of his master trial exhibit list the defendants shall designate those exhibits which apply to asbestos litigation generally that they reasonably anticipate will actually be offered into evidence at trial.

i. The plaintiffs and defendants shall be precluded from listing or calling at trial any witnesses, or offering into evidence at trial any exhibits, not designated in accordance with the requirements of paragraphs a through h above. Upon a showing of extraordinary circumstances and good cause, a party may request the court in the interest of justice to be allowed to list and call a witness, or offer an exhibit, not designated as required herein above.

j. That plaintiff be required by February 4, 1983 to file with the court and serve on defendants a statement designating his co-worker, exposure and product identification witnesses (including the plaintiff) who will actually testify at trial along with the identification of all other evidence upon which the plaintiff intends to rely to establish the identification of each particular individual defendant as being a defendant whose product or products to which the plaintiff was exposed (designating separately as to each defendant the specific portions of such other evidence allegedly applicable to that defendant); and with regard to the witnesses (including the plaintiff) so designated providing the following information about each:

(1) Name, address and telephone number.

(2) The asbestos-containing products which each witness can identify by brand name, if known, and if not known, by generic name, and if he knows, specific application.

(3) For each such asbestos-containing product in (2) above, the defendant to which the witness attributes said product, if the witness thinks he knows the product's seller or manufacturer (and if not, to whom the plaintiff or plaintiff's attorneys contend such product is attributed).

(4) For each such asbestos-containing product and defendant to which it is attributed pursuant to (2) and (3) above, to the best of witness' knowledge, the dates, spe-

cific jobs, job sites and specific locations within each job site where the witness contends said product was seen or used.

(5) As to each such witness, whether or not the witness has been deposed in any asbestos-related action; and if so, the title of the case (or cases) in which the deposition was taken, the jurisdiction involved and the approximate date of the deposition or depositions.

k. Any defendant to which no product is attributed by timely compliance with sub-paragraphs j(1), (2) and (3) as to testimonial evidence to be presented by witnesses or by timely compliance with paragraph j with respect to the identification of other evidence, shall, upon written application to the court served upon the plaintiff, be entitled to the entry of an order dismissing plaintiff's action with prejudice, unless the plaintiff shall thereafter file with the court and serve on defendants, within five days of the service of defendant's application, a supplementary statement as to that defendant which fully complies with the above required identification of evidence.

Any defendant which has not responded to interrogatory No. 8 of the plaintiff's second interrogatories and request No. 6 of plaintiff's request to produce by January 31, 1983, as required herein, shall not be entitled to avail itself of this provision until it serves such responses and plaintiff then fails to comply with paragraph j for ten days after defendant's responses are served.

Additionally, the plaintiff shall be precluded from listing or calling as a witness any co-worker, exposure or product identification witness not listed and designated by February 4, 1983; and plaintiff shall also be precluded from using any other evidence to establish the identification of any particular individual defendant as being a defendant to whose product or products the plaintiff was exposed if such evidence was not identified by February 4, 1983 in the manner required by paragraph j above. Further, with regard to co-worker, exposure or product identification witnesses (including the plaintiff himself) listed by

the plaintiff by the February 4, 1983 deadline as set out above, if plaintiff fails to provide with his designation any of the information required in sub-paragraphs j (1)–(3) above, he shall be precluded from using said witness or said witness' testimony for any purpose (and with regard to himself, that he be precluded from testifying with regard to product identification.) With regard to any co-worker, exposure or product identification witness designated under sub-paragraph j(1) above (including the plaintiff himself) the plaintiff shall be bound by the product identification information provided under sub-paragraphs j(2) and j(3) above; and said witness (including the plaintiff) may not later be used by the plaintiff to identify any additional asbestos-containing products or product manufacturers.

Upon a showing of extraordinary circumstances and good cause, the plaintiff may request the court in the interest of justice, to be relieved of the preclusive effects of this paragraph.

The order also sets the time for filing motions for summary judgment and responses thereto as well as a time for completion of discovery, attorneys' conference and final pretrial conference.

Pretrial orders similar to the one entered in this case have become an established part of asbestosis litigation. Experience has shown that most plaintiffs sue a broad spectrum of asbestos miners, manufacturers and distributors in the hope of not overlooking any possible defendant. A properly conducted discovery process allows the plaintiff to develop his case against the defendants who mined, manufactured and/or sold the asbestos products to which the plaintiff was exposed, and allows the other defendants to get out of the case prior to the expense of a lengthy trial.

During February 1983 defendants moved for summary judgment primarily upon the grounds that plaintiff's claims were time barred either under the North Carolina "Statute of Repose", N.C.G.S. § 1–15(b) or because of inadequate product identifica-

tion by the plaintiff during the discovery period. On February 18, 1983 plaintiff filed an affidavit of three and a half pages in which he affirmed in very general language, containing no information as to dates, that he had used various asbestos materials of Keene, Forty-Eight Insulation, Pittsburgh Corning, Celotex and H.K. Porter while employed at Seymour Johnson Air Force Base.

Defendants moved to strike this affidavit as not being timely under the terms of the First Pretrial Order, and as failing to comply with said order in not naming the products of the defendants and the time, place and circumstances of his exposures thereto. The motions asked that the affidavit be suppressed because its contents were contrary to and in contradiction of the plaintiff's lengthy depositions. Defendants' contention was that the affidavit was an attempt to create an issue of fact when the only issue actually created by the affidavit was the credibility of the plaintiff, i.e. which was true, his affidavit or his deposition?

By order dated April 1, 1983 the district court granted the motions for summary judgment. The court found that plaintiff had his first chest x-ray on December 16, 1978. The diagnosis of asbestosis was disclosed to plaintiff on January 10, 1979. Although the plaintiff contends that his cause of action accrued when he was x-rayed, the court found that there was no

evidence to show that he knew or should have known that he had asbestosis until January 10, 1979. The court, therefore, fixed the January date as the accrual date from plaintiff's cause of action.

In discussing N.C.G.S. § 1–15(b) the court stated:

This statute enacted in 1971 superimposes upon the provisions of the general three-year statute of limitations an outer limit for bringing an action which is totally unrelated to the time of the accrual of the cause of action. The ten-year outer limit is therefore not a conventional statute of limitations but rather is a statute of repose which bars suits for personal injuries brought after ten years have expired from the defendant's last act, regardless of the date on which the cause of action accrues. *See Buckner v. GAF Corporation*, 495 F.Supp. 351, 355 (E.D.Tenn.1979) (discussing similar Tennessee statute).

Upon being confronted by the motions of the defendants for summary judgment based upon the properly pleaded statute of limitations it thus became encumbent upon the plaintiff to come forward with evidence sufficient to create a genuine issue of material fact as to whether the last act of each defendant giving rise to his cause of action occurred within the ten year period prior to January 10, 1979.[3] In an attempt to do this the plain-

---

**3.** There is a conflict in the district court's interpretation of the application of the statute of repose. The court first states that the statute of repose is a limitation "totally unrelated to the time of accrual of the cause of action. The ten year outer limit is therefore not a conventional statute of limitations but is rather a statute of repose which bars suits for personal injuries brought after ten years have expired from the defendant's last act, regardless of the date on which the cause of action accrues."

In the next paragraph the court states "... it thus became encumbent upon the plaintiff to come forward with evidence sufficient to create a genuine issue of material fact as to whether the last act of each defendant giving rise to his cause of action occurred within the ten year period prior to January 10, 1979." This is the date the plaintiff was advised of the results of the chest x-ray and of the fact that he had asbestosis.

Our interpretation is that the ten year period should end the date the complaint was filed (November 9, 1979 for defendants other than Pittsburgh Corning and June 3, 1981 for Pittsburgh Corning) and not the date plaintiff was advised of the asbestosis diagnosis. In *Raftery v. Wm. C. Vick Const. Co.*, 291 N.C. 180, 230 S.E.2d 405 (1976) the Supreme Court of North Carolina in quoting the pertinent provision of G.S. § 1–15(b) ("[p]rovided that in such cases the period shall not exceed 10 years from the last act of the defendant giving rise to the claim for relief") defined the term "period" as "the period within which the action may be brought." *Id.* at 410. The court also stated "the action must be brought within ten years from the wrongful act or default even though the plaintiff did not discover the injury until later." *Id.* Although the district court's interpretation does not appear to us to be in accord with North Carolina law, this does not affect the result of

tiff has filed his own affidavit in which he avers:

"3. That during his approximate twenty years of employment he would say that he was exposed to asbestos-containing products by breathing into his lungs the dust from said products on thousands of different days during his employment period and that on each of those days he would breathe into his lungs thousands of individual breaths of air containing the air-borne asbestos particles of the various defendants listed herein below.

4. That the undersigned knows of his own personal knowledge that each of the defendant (sic) named herein below in this Affidavit manufactured asbestos-containing insulation products which came to emit airborne particles of asbestos as a result of their manipulation and use and that particles of asbestos from each of the Defendants named below were breathed into his lungs and remain there today and that each of the Defendants named herein below have individually contributed and caused his asbestos disease and the other physical and emotional and mental injuries that he has experienced as a result of his asbestosis and asbestos-related diseases.

The affidavit goes on to allege with respect to each defendant (except the defendant Carey-Canada which is not named at all in the affidavit) that "during his years at Seymour Johnson Air Force Base" plaintiff came into contact with and was exposed to asbestos containing products manufactured by each defendant.

Plaintiff contends that this evidence gives rise to an inference from which a jury could find that plaintiff's exposure to the products of defendants occurred within the ten-year period January 10, 1969—January 10, 1979. If this is true, it would logically follow that the con-trary inference would also arise. The truth is that the evidence does not give rise to any inference as to when the plaintiff was exposed to the asbestos-containing products of any defendant during the twenty years he was employed at Seymour Johnson Air Force Base.

On oral argument counsel for plaintiff conceded that if the foregoing were the only evidence offered by the plaintiff at trial defendants would be entitled to a directed verdict at the close of the plaintiff's evidence. Counsel argued, however, that the evidence was sufficient to withstand a summary judgment motion and he forecast that additional evidence (not specified but presumably to come from the plaintiff himself since the use of other witnesses for this purpose had been foreclosed by a pretrial order) would be produced at trial. While it is true that a party responding to a summary judgment motion need not disclose all his evidence, the rule specifically provides that he "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or. as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Rule 56 F.R. Civ.P. The party may rely only on those inferences of which the evidence is reasonably susceptible, and may not resort to speculation.

The district court concluded that plaintiff had not created a genuine issue of material fact as to exposure to any of the products of the six remaining defendants during the ten year period. As to the claim of negligent failure of defendants to warn the plaintiff of the hazard to which he was being subjected, the court ruled that the North Carolina General Assembly in adopting the statute of repose "intended to bar absolutely claims discovered more than ten years after defendants' last act giving rise to the claim and that proof that the failure

the case, because whether the 10 years is from January 10, 1969 to January 10, 1979 as the district court found, or November 9, 1969 to November 9, 1979 (or June 3, 1971 to June 3, 1981 as to Pittsburgh Corning) as we think it should be, there were no acts by any of the defendants during these 10 year spans giving rise to the claim for relief.

to warn was intentional rather than negligent should not constitute an estoppel that would override the absolute bar. The court still adheres to that ruling [4] and, since the plaintiff has not created a genuine issue of fact as to whether the last act of any of the defendants whose cases are now under consideration occurred within the ten-year period prior to January 10, 1979,[5] it is not open to the plaintiff to invoke the doctrine of equitable estoppel in this case."

The consented pretrial order, which has been extensively quoted herein, was entered some 30 months after this action was commenced. Extensive discovery preceded this order and the court determined that the preliminaries were over and that it was time to narrow the issues, to pierce the pleadings to find the real issues in dispute, and to prepare a very complex case for a jury trial. Asbestosis cases by their very nature are difficult to try and difficult for a jury to understand.

Asbestosis develops over a period of many years and usually after long exposure to various products containing asbestos fibers. During the time of incubation of the disease, a person may be exposed to asbestos in many forms from products mined, manufactured and sold by many different companies. When an asbestosis complaint is filed, neither the plaintiff nor his attorney is sure as to the product exposure that he may be able to prove. Usually all asbestos related companies are named as defendants, and the present action is typical since it began with eighteen defendants. Better interrogation of prospective plaintiffs on product contact could prevent the joining of so many unnecessary defendants. However, the joining of multiple defendants has produced settlements from some companies which find it more economical to negotiate a reasonable settlement than to shoulder the expense of many months of discovery prior to a successful summary judgment motion or a protracted trial.

District courts, which have adopted a "hands on" type of case management for asbestosis litigation, have generally succeeded in disposing of these cases in a fair and expeditious manner within a reasonable time. The key to proper management in asbestosis cases is the pretrial order which requires all parties to complete certain tasks within a definite time frame. The dates and duties established in the present pretrial order are not unduly burdensome to either the plaintiff or the defendants. The order requires the parties to do what anyone should do in preparation for trial of a complex case. After 30 months of discovery each party should know the witnesses to be called and the nature of their expected testimony. They should also have assembled all exhibits and been able to provide a list of them.

Asbestosis cases have standard groups of witnesses. State-of-the-art witnesses testify as to the hazards of exposure to asbestos products and when the asbestos miners, manufacturers and distributors knew or should have known of these dangers. The diagnostic witnesses are physicians who have examined the plaintiff, and the treating physicians are those who have actually treated the plaintiff for his condition and can discuss his physical condition and his prognosis.

The exposure, coworker, and product identification witnesses are very important because they testify as to the asbestos products of the various defendants to which the plaintiff has been exposed. These witnesses also relate the dates, places, and length of exposure to the products.

The requirements of the pretrial order are not set in stone, but may be relaxed for good cause, extraordinary circumstances, or in the interest of justice. However, the terms of the order must be firmly and fairly enforced by the district judge if it is to serve the purpose of pretrial management designed "to secure the

---

**4.** This refers to a ruling of the court in another asbestosis case, *Whitehead v. Johns-Manville Sales Corporation, et al.,* No. 80-30-Civ-2.

**5.** *See* footnote 3, *supra.*

just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1. The district court handled the pretrial activities in a fair manner.

The appellant challenges the constitutionality of the North Carolina Statute of Repose as applied to an occupational disease claim, stating that it is inconsistent with both the state and federal constitutions because it violates the equal protection clause of the fourteenth amendment to the United States Constitution and the "open-courts" and equal protection guarantees of Article I, §§ 18 and 32 of the North Carolina Constitution.

Appellant further contends that if the statute of repose is constitutional the record in this case reveals genuine issues of material fact which preclude the granting of summary judgment.

## II

As a general rule an appellate court should not decide a constitutional question if the case can be disposed of on some other issue. However, we cannot avoid the present challenge to N.C.G.S. § 1–15(b) because the plaintiff cannot prove contact with Pittsburgh Corning Corporation, one of the defendants, after 1968, and this last contact with the product is more than ten years prior to the date the action was filed against Pittsburgh Corning, June 3, 1981.

Plaintiff argues that the statute is unfair and deprives plaintiffs with asbestosis as well as plaintiffs with diseases that may take years to manifest themselves, equal protection of the laws. It has long been held that the government has an obligation to provide citizens with all needful remedies, but it also may establish time limits within which these remedies may be sought. *U.S. v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979); *Wilson v. Iseminger*, 185 U.S. 55, 22 S.Ct. 573, 46 L.Ed. 804 (1902).

There is a strong presumption of validity and constitutionality of a statute. The Supreme Court stated in *Flemming v.*

*Nestor*, 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1959):

> Moreover, the presumption of constitutionality with which this enactment, like any other, comes to us forbids us lightly to choose that reading of the statute's setting which will invalidate it over that which will save it. "[I]t is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void." *Fletcher v. Peck*, 6 (10 U.S.) Cranch 87, 128, 3 L.Ed. 162.

*See also United States v. National Dairy Corp.*, 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1969) and *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932).

Although plaintiff argues that § 1–15(b) restricts the rights of latent injury plaintiffs, the challenged section actually improves the lot of a North Carolina plaintiff and allows the prosecution of many actions that would have formerly been time barred. Prior to § 1–15(b) North Carolina plaintiffs were subject to a strict common law rule that the cause of action accrued at the time of the occurrence of any injury, however slight, regardless of whether the plaintiff was aware of the injury. By adopting the "discovery rule" the accrual of a cause of action was postponed until the plaintiff knew or should have known of his injury.

The Supreme Court of North Carolina explained the legislative purpose for adopting § 1–15(b) in *Raftery, supra*. 230 S.E.2d at 409–410.

> The purpose of GS1–15(b) was to give relief to injured persons from the harsh results flowing from this previously established rule of law. By enactment of this statute in 1971, the Legislature provided that a cause of action, having as an essential element bodily injury or a defect in property, "which originated under circumstances making the injury, defect or damage not readily apparent to the claimant at the time of its origin," is deemed to have accrued at the time the injury was discovered or ought reasonably to have been discovered by the claimant. Thus, the purpose of this stat-

ute is to enlarge, not to restrict the time within which an action for damages could be brought.

To prevent the statute from subjecting tort feasors to suit for alleged acts or defaults so far in the past that evidence as to the event would be difficult to secure and intervening causes would be likely, though difficult to prove, the legislature added the proviso: "[p]rovided that *in such cases* the period [i.e., the period within which the action may be brought] shall not exceed 10 years from the last act of the defendant giving rise to the claim for relief." (Emphasis added.) Expressly, the proviso is limited to "such cases"; that is, the proviso applies only to cases in which the bodily injury, or defect in property, for which damages are sought was not readily apparent to the claimant at the time of its origin. In such case, the action must be brought within ten years from the wrongful act or default even though the plaintiff did not discover the injury until later.

In a concurring opinion, 230 S.E.2d at 413, Justice Exum explains:

It is clear to me that the words "bodily injury to the person or a defect in or damage to property" refer to bodily injury to the claimant or a defect in or damage to property. *belonging to the claimant* which injury, defect or damage is latent, or, in the words of the statute "not readily apparent to the claimant."

This explanation of the purpose of § 1–15(b) answers the plaintiff's argument that there was no legislative purpose for the enactment and that the legislature was not aware of latent type injuries. One obvious purpose of the statute is to allow latent claims to be brought after their discovery and not to bar them by a rule counting time from the actual date of injury, no matter how slight. The legislature of North Carolina adopted the more lenient date of discovery rule but limited it with a ten year statute of repose.

■ As explained by the Supreme Court of North Carolina, the legislature in adopting the date of discovery rule improved the

lot of certain plaintiffs, but also considered the rights, duties and obligations of potential defendants. *Raftery* clearly explains the problems created by the old North Carolina "date of injury rule" and the North Carolina legislature's response to the problem. Plaintiffs with injuries not readily apparent at the time of injury are not charged with notice of the injury until discovery—a great benefit to plaintiffs. Defendants in such cases have lost the old protection of accrual being determined by the date of injury (even though the injury may not have been known to the plaintiff). Defendants have, however, received the balancing consideration (ten year statute of repose) giving them some protection from stale claims.

■ Plaintiff claims that he is a member of a special class of claimants with latent disease who are adversely affected by § 1–15(b). As explained above, the statute does not adversely affect claimants with latent diseases, but actually expands their rights and opportunities to recover. The legislature has been careful to provide a statute that is as broad as possible in order to insure that plaintiffs with both latent and patent personal injury claims would receive an adequate opportunity to pursue them. The ten year statute of repose does not create a special class of defendants. Instead, the statute applies to any defendant where a plaintiff can allege a cause of action "having as an essential element bodily injury to the person ... which originated under circumstances making the injury ... not readily apparent to the claimant at the time of its origin."

■ Although a certain number of plaintiffs will always have a problem with a statute of limitation or repose, this does not mean that they have been denied a constitutional right. Statutes limiting the time within which an action may be brought are the result of a legitimate legislative determination which balances the rights and duties of competing groups. Such statutes serve a necessary function in the fair administration of justice. The phi-

losophy of such statutes is set forth in *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945):

> Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedience, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost. *Order of Railroad Telegraphers v. Railway Express Agency,* 321 U.S. 342, 349 [64 S.Ct. 582, 586, 88 L.Ed. 788]. They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate. Their shelter has never been regarded as what now is called a "fundamental" right or what used to be called a "natural" right of the individual. He may, of course, have the protection of the policy while it exists, but the history of pleas of limitation show them to be good only by legislative grace and to be subject to a relatively large degree of legislative control. [footnote omitted]

Statutes of limitations affect the remedy and not the right. They remove the court as a forum for enforcing the right.

The constitutionality of § 1–15(b) was not attacked in *Raftery* and the Supreme Court of North Carolina has not yet had a direct challenge to its constitutionality. However, in *Lamb v. Wedgewood South Corp.,* 308 N.C. 419, 302 S.E.2d 868 (1983) that court rejected an attack on the constitutionality of N.C.G.S. 1–50(5) which establishes a six year statute of limitation for actions arising out of the defective or unsafe condition of an improvement to real property. Section 1–50(5) is not a "discovery" statute but runs from "the later of the specific last act or omission of the defendant giving rise to the cause of action or substantial completion of the improvement."

In *Pitts v. Unarco Industries, Inc.,* 712 F.2d 276 (7th Cir.1983) the court considered the claim of an asbestosis victim, who challenged the Indiana ten year statute of repose, and stated:

> The ten-year limitations rule creates two classes of people: those injured by products more than ten years old and those injured by products less than ten years old. Those in the first class are prevented from bringing suit upon the same causes of action that those in the second class can bring. The effect of this is to lessen the risk of loss—i.e., from having to pay for injuries resulting from use of a defective product—manufacturers face when they place a product into the stream of commerce. That is a legitimate legislative purpose, and it is not the courts' business to instruct the Indiana legislature when it is better for consumers than producers to bear that risk.

*Id.* at 280.

In *Hawkins v. D & J Press Co., Inc.,* 527 F.Supp. 386, 389 (E.D.Tenn.1981) Tennessee's ten year product liability statute of repose was attacked as being unconstitutional. The court sustained constitutionality and explained the legislative purpose for such statutes:

> The ten year ceiling is clearly an attempt by the Legislature to create a reasonable time frame to enable manufacturers and distributors as well as their insurance carriers to calculate injury claims arising from the production of goods without compromising the rights of users or consumers of such goods to bring actions for damages within a reasonable number of years after the sale of the product. Although the proposed Uniform Product Liability Act... provides for a ten year limit without an absolute cut off date, the Court cannot say that the Tennessee act which does provide an absolute limit would be impermissibly arbitrary.

In *DiAntonio v. Northampton Accomack Memorial Hospital,* 628 F.2d 287

(4th Cir.1980) we upheld the Virginia Medical Malpractice Act and found that different treatment of medical malpractice plaintiffs from other tort plaintiffs was not a denial of equal protection because there was a rational basis for the classification. The classification was based on the special problems posed by soaring insurance costs in the medical field. Rational basis is the proper test, because the statute of repose does not infringe a fundamental right nor does it involve a suspect classification. In *Schweiker v. Wilson*, 450 U.S. 221, 230, 101 S.Ct. 1074, 1080–81, 67 L.Ed.2d 186 (1981) the Supreme Court stated that the rational basis test required "that the legislation classify the persons it affects in a manner rationally related to legitimate governmental objectives." The legitimate governmental objectives have been sufficiently described in *Raftery, supra.*

■ The plaintiff's argument that he has been denied equal protection because there is no legitimate public purpose to § 1–15(b) and because the statute promotes the interest of special groups over injured parties and the public in general is without merit. Repose in the law is a legitimate public concern, and the repose granted after ten years by § 1–15(b) is balanced against the plaintiff's expanded rights under the statute.

■ Plaintiff attacks the statute as being in violation of Article 1, Section 18 of the Constitution of the State of North Carolina which provides:

> *Courts shall be open.* All courts shall be open; every person for an injury done to him in his lands, goods, person, or reputation shall have remedy by due course of law; and the right and justice shall be administered without favor, denial or delay.

The important words in § 18 are "by due course of law". Such due course of law has been established by the legislature of North Carolina. The plaintiff's "remedy" is subject to due course of law as established by the legislature, which has the power to define the circumstances under which a remedy may be pursued. See *Lamb v. Wedgewood South Corp., supra.*

The problem of the statute is put in proper perspective by the court in *Lamb,* 302 S.E.2d at 879: "[a]s to whether an act is good or bad law, wise or unwise, it is a question for the legislature and not for the courts—it is a political question."

### III

Plaintiff argues that the district court was in error in granting summary judgment to the defendants because the record reflects genuine issues of material fact. The various defendants moved for summary judgment based upon the entire record in the action which included depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production. The defendant Pittsburgh Corning Corporation sought summary judgment on the ground that the record showed that the plaintiff's claim against it was barred by N.C.G.S. § 1–15(b). The other defendants sought summary judgment on the ground that there was no genuine issue of material fact and that the plaintiff had no knowledge of any facts or circumstances involving product identification or product exposure sufficient to make these defendants liable to the plaintiff. The defendants also moved to suppress or strike the plaintiff's affidavit, which was prepared in response to the Rule 56 motion.

It is well established that a defendant moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that he is entitled to judgment as a matter of law. This burden may be met by use of the depositions and other discovery materials. *Seago v. North Carolina Theaters, Inc.,* 42 F.R.D. 627, 632 (E.D.N.C.1966), aff'd, 388 F.2d 987 (4th Cir.1967). Once a defendant makes the necessary showing, the plaintiff must go forward and produce evidentiary facts to support his contentions. "A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on

which a jury might rely." *Seago, supra,* 42 F.R.D. at 640.

Federal Rules of Civil Procedure 56(e) provides:

(e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

The Advisory Committee's notes to this rule state in part: "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."

The plaintiff was twice deposed by the defendants. These depositions took several days and were quite extensive. They covered plaintiff's entire work history, dates of employment, type of job and duties, his medical history and his exposure to asbestos containing products manufactured by any and all of the defendants. Product identification testimony was assisted by the use of a booklet showing pictures of the various asbestos products of the defendants and also pictures of the outside cover of the bag or wrapper used for each product.

Plaintiff was aware that product identification and exposure would be an important part of his case because he testified that when he was advised by the doctor in January 1979 that he had asbestosis, he immediately began to check on the asbestos content of the products and materials that he had used.

The record shows that from 1960 through 1966 plaintiff had worked as a plumber and his duties placed him in constant contact with many asbestos materials and products. However, in 1966 he became a heating repairman and continued on this job through 1981. As such his exposure to asbestos was significantly reduced.

Products made by Johns-Manville and Raybestos Manhattan were the products of most frequent contact according to the plaintiff. Each of these companies was originally a defendant in this litigation, but as previously noted, eleven of the original eighteen defendants have either been dismissed or settled with the plaintiff.

Plaintiff also identified various coemployees who had worked with him. He knew that these men lived in or near Goldsboro, North Carolina. For some reason these coworkers were not deposed and their names were not listed as product identification or exposure witnesses and were not filed by February 4, 1983 as required by the pretrial order. Plaintiff was therefore precluded from using them in the event of trial. As a result, any production identification testimony at trial would of necessity have to come from the plaintiff. His testimony as to product identification and exposure was developed in his two depositions and will be discussed as it applies to the remaining defendants. In an effort to resurrect his law suit when faced with the summary judgment motion, plaintiff filed the affidavit, previously mentioned, in the hope of creating an issue of fact as to exposure to defendants' products. Paragraphs 3 and 4, set forth above, are typical of the general language of the affidavit and contradict plaintiff's sworn deposition testimony as to exposure and use of products. The district court was correct in finding this affidavit did not

measure up to the requirements of Rule 56(e).

■ The entire content of the affidavit is conclusory, it does not set forth facts of which the plaintiff has personal knowledge and it does not give specific facts, but only generalities. "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Research and Development Co. v. Singer*, 410 F.2d 572, 578 (2d Cir. 1969). A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct. *Radobenko v. Automated Equipment Co.*, 520 F.2d 540, 544 (9th Cir.1975).

The plaintiff knew that product identification and exposure would be important to his lawsuit even before the suit was brought, as evidenced by his testimony that he immediately began checking on the asbestos content of various products he had used. His affidavit is a vain effort to create an issue of fact by general statements after three years of discovery had produced little or nothing as to the remaining defendants.

## AS TO PITTSBURGH CORNING CORPORATION

■ It is clear from plaintiff's testimony that he was exposed to products containing asbestos and manufactured by Pittsburgh Corning during 1968. Since his suit against Pittsburgh Corning was not filed within ten years after the last alleged exposure, Barwick's claim against that defendant is barred by N.C.G.S. § 1–15(b).

■ At argument plaintiff's attorneys advised this court that they had a "new theory" that they wished to present and for the first time contended that the accrual

date should be December 16, 1978, the date of the x-ray, and that this would avoid the bar under the North Carolina statute of repose. Subsequent to the argument they submitted a supplemental brief to support this "new theory". However, this effort is to no avail.[6] Even under an interpretation of the ten year period using the date of accrual rather than the date the suit was filed, the record is clear that the plaintiff did not know of his condition until he was told by his physician on January 10, 1979. In fact, he testified that he had never heard of the disease asbestosis until he was told on that date that he was suffering from this condition. The "new theory" is similiar to the plaintiff's effort to rescue his case by his affidavit filed in response to the defendants' summary judgment motions.

## AS TO KEENE CORPORATION

■ Since plaintiff is precluded from using other witnesses to prove exposure to defendants' products, the only evidence regarding exposure to asbestos-containing products allegedly manufactured by Keene Corporation is the plaintiff's testimony by deposition and his affidavit. In paragraph 8 of the affidavit he states:

That during his years at Seymour Johnson he came in contact and was exposed to asbestos containing products manufactured by Keene Corporation or a company that it has bought. These products included Super Powerhouse Cement, Powerhouse Cement, Thermoseal Pipe Covering, and Eighty-Five Percent Magnesia Pipe Cover and Block. When these products were moved, installed, or ripped out they created airborne asbestos dust and he breathed that dust into his lungs and that dust contributed to his diseased condition.

In his depositions the defendant stated that he could not identify the manufacturer of any asbestos-containing product that he had ripped out of any installation at Seymour Johnson. Plaintiff's attorney conced-

---

**6.** As discussed in footnote 3, this court's reading of the North Carolina Supreme Court's opinion in *Raftery* is that the statute of repose extends backward in time ten years before the filing of the complaint.

ed to the district judge that as to Keene the affidavit did not have language based upon the personal knowledge of the plaintiff as required by Rule 56(e). There is nothing in the affidavit about any company or companies that Keene may have purchased nor does the affidavit contain any information about asbestos products that these companies may have produced nor does it relate the terms and conditions of any purchase agreements or any agreement by Keene to assume any liabilities of such companies.

Keene, in its answers to interrogatories, denied that it had ever manufactured, processed, fabricated, sold or distributed thermal insulation products. Plaintiff has introduced no evidence to the contrary. Powerhouse Cement never contained asbestos. Thermoseal Pipe Covering was not listed in the plaintiff's compliance with the pretrial order against Keene and could not be considered because of the preclusive effect of the pretrial order. There is a Keene product Thermasil, but plaintiff testified in his first deposition that he had no personal knowledge of having been exposed to Thermasil or Eighty-Five Percent Magnesia block and pipe covering material allegedly manufactured by Keene and plaintiff stated that information as to this would have to come from someone else. This evidence has not been presented. A Keene product by a similar name "Thermalite" was manufactured through 1963 and was made of eighty-five percent magnesium carbonate, but plaintiff specifically denied recalling ever seeing this product.

The plaintiff testified at deposition that he had used Super Powerhouse Cement. The record shows that this product in its usual form never contained asbestos, but there was a formulation containing five percent asbestos developed to conform to government specifications, but all asbestos was eliminated from this product in February 1971. However, plaintiff's testimony shows that he had only seen the name of this product on a bag in the late 1970s and he did not know whether this was the basic Super Powerhouse Cement with no asbestos or whether it was a left over bag containing the government specification prod-

uct. In any event, this possibility is not sufficient to create a genuine issue of material fact.

## AS TO CELOTEX CORPORATION

As to this defendant the plaintiff's affidavit is the only source of information about any product manufactured by Celotex Corporation or its predecessor corporation, Phillip Carey Corporation. Paragraph 17 of the affidavit asserts:

> Celotex was one of the companies that also manufactured asbestos products that were used and to which he was exposed during his years at Seymour Johnson Air Force Base. These products included Carey Cement, Air Cell Pipe Covering and Board, Carey Cell Pipe Covering and Board, No. 100 Finishing Cement and asbestos paper pipe covering. When these products were moved, installed, or ripped out they created airborne asbestos dust which he breathed into his lungs and which have contributed to his diseased condition.

During his depositions the plaintiff looked at pictures of the various Celotex Corporation and Phillip Carey Corporation products and testified "I don't recall being around any." At his depositions, the plaintiff had with him a list that he had prepared setting forth the name of his employer, the job site, the asbestos products used and the coworkers with him at the time. No Celotex or Phillip Carey product is shown on this list and the plaintiff did not list any products of these two corporations on his product identification list. The eleventh hour affidavit is an effort to keep Celotex in the litigation after three years of discovery have produced nothing to show contacts with its products. The affidavit clearly contradicted his prior sworn testimony given with the aid of his prior notes and identification exhibit and with the assistance of the book showing all of the products produced by this defendant. The district judge was correct in concluding that no genuine issue of material fact was creat-

ed by the affidavit under these circumstances.

## AS TO FORTY–EIGHT INSULATIONS, INC.

■ As to this defendant the plaintiff attempts to build one vague inference upon another vague inference to produce a factual issue. His affidavit states:

During his years at Seymour Johnson he also came in contact with products manufactured by Forty-Eight Insulation Company that included Quick-Setting and Finishing Cement, and Super 48 Cement. These products created airborne dust that he breathed into his lungs and contributed to his illness.

In his deposition he named "Quick-Setting Cement" as a product he had seen, but he could not remember when or where he had seen it or used it although he thought it was while he was at Seymour Johnson. When asked when he may have used the product at Seymour Johnson, he stated that he could not recall. The record shows that in December 1970 the defendant Forty-Eight Insulations, Inc. ceased all manufacture and sale of asbestos containing products and insulation material sold thereafter did not contain asbestos. The plaintiff would have the court draw an inference that he used a Forty-Eight product containing asbestos and would then have the court draw the further inference that he used it after November 9, 1969. He did not list Forty-Eight Insulations in his notes or on his product identification exhibit. No issue of fact exists as to Forty-Eight.

## AS TO H.K. PORTER

■ At his depositions the plaintiff reviewed the pictures of products and labels, but did not testify to exposure to any product manufactured, distributed, or sold by H.K. Porter. At one point in his deposition he stated that he thought H.K. Porter manufactured an asbestos cloth, but two questions later, he stated that it was Amatex and not Porter he had in mind.

In his response to interrogatories requesting information as to products, trade names and manufacturers of products to which he had been exposed, he did not list any product of Porter. In his affidavit he stated that the Porter products included "rope, cloth, and a product called Flame Guard." In his deposition he stated that the rope and cloth products were manufactured by Amatex and Raybestos Manhattan and not Porter. Porter does not appear on his product identification exhibit. Again plaintiff is trying to keep a defendant in the case with his last minute affidavit which does not comply with Rule 56(e) because it is not made on personal knowledge and does not really set forth facts, but mere conclusions. The district court was correct in deciding that a genuine issue of fact had not been created by paragraph 18 of the affidavit.

## AS TO CAREY CANADA AND FIBREBOARD CORPORATION

No product of Carey Canada is mentioned in the affidavit and the claim as to it ended when the court found that there had not been proper service of process upon this defendant and the plaintiff consented to a dismissal. Plaintiff's brief indicates that he has settled with Fibreboard Corporation.

■ On oral argument before the district court the plaintiff's attorney conceded that if the affidavit of plaintiff submitted in opposition to the summary judgment motion were the only evidence offered by the plaintiff at trial, the defendants would be entitled to a directed verdict at the close of the plaintiff's evidence. He now argues that in spite of this concession he should still be allowed to go to trial even though he is precluded from putting up any additional evidence on product contact and exposure. In over three years of discovery the plaintiff obviously developed sufficient evidence of contacts with the products of a number of defendants who have now set-

tled out of the case, but he has not created an issue of fact as to the five remaining defendants sufficient to withstand the summary judgment motion. Genuine issues of material fact cannot be based on mere speculation or the building of one inference upon another.

█ Appellant asserts that it is not necessary that he rely exclusively on direct exposure to defendants' products after 1969, because of his allegation that the defendants failed to adequately warn him of the dangerous propensities of asbestos and that this is a continuing duty. To follow the defendant's reasoning would do away with the limitation intended by N.C. G.S. § 1–15(b) and would be against the plain language of the statute. In referring to the date of accrual the legislature established the ten year period: "Provided that in such cases the period shall not exceed ten years from the *last act* of the defendant giving rise to the claim for relief." (Emphasis added). The "last act" in a failure to warn situation must certainly have occurred no more recently than the most recent contact or exposure to the product which allegedly contained an inadequate warning. Plaintiff argues that the ten year period has not yet started to run because he has yet to be provided with an adequate warning. This would read the limit out of the statute and would be clearly against the language of the statute and the intent of the statute as explained in *Raftery, supra.*

AFFIRMED.